**W. B. JOHNSTON GRAIN COMPANY and Johnston Seed Company, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 8514.

United States Court of Appeals Tenth Circuit.

Aug. 22, 1966.

Rehearing Denied Oct. 5, 1966.

Frank Carter, Enid, Okl. (Otjen, Carter & Huddleston, Enid, Okl., of counsel, on the brief), for petitioner.

Elliott C. Lichtman, Atty., NLRB (Arnold Ordman, Gen. Counsel, NLRB, Dominick L. Manoli, Associate Gen. Counsel, NLRB, Marcel Mallet-Prevost, Asst. Gen. Counsel, NLRB, and Nancy M. Sherman, Atty., NLRB, on the brief), for respondent.

Before PHILLIPS, JONES,* and BREITENSTEIN, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

This is a petition to review an order of the National Labor Relations Board,[1] issued against the W. B. Johnston Grain Company and Johnston Seed Company, two Oklahoma corporations, with common officers, ownership, directors and operators, and a common labor policy, and which together constitute a single integrated business enterprise. They will be referred to hereinafter collectively as the Company.

In its answer the Board sought enforcement of the order.

On August 19, 1963, the Company and the American Federation of Grain Millers, AFL–CIO,[2] executed a stipulation for an election by the Company's em-

* Of the Fifth Circuit, sitting by designation.

1. Hereinafter called the Board.

2. Hereinafter called the Union.

ployees in an agreed-upon unit, which embraced its production and maintenance employees. The election was held on September 17, 1963, and a majority of the employees in such unit voted in favor of the Union acting as their bargaining representative. On September 25, 1963, the Board certified the Union as the exclusive bargaining representative of the employees in the unit.

Following such certification, 10 bargaining sessions were held between representatives of the Company and the Union, during the period from September 25, 1963, to August 19, 1964. Although the bargaining resulted in an agreement upon some issues, it did not reach the point of an agreement on the terms of a contract.

On July 20, 1964, the Union had filed a charge against the Company, which alleged that the Company had unlawfully refused to bargain with the Union, in violation of § 8(a) (5) and (1) of the National Labor Relations Act.[3]

A settlement agreement was executed by the Company on August 18, 1964, and by the Union on August 19, 1964. It was approved on August 20, 1964, by the Regional Director of the Board. By the terms thereof, the Company agreed to bargain collectively upon request with the Union, as the exclusive representative of all the employees in the bargaining unit, and to post the appropriate notice. Contingent upon the Company's compliance, the parties agreed that no further action would be taken in the case. The Company posted such notice.

On the day the settlement agreement was approved, the Company and the Union engaged in bargaining for several hours. The Union requested a 25 cent per hour wage increase. The Company countered with an offer of 5 cents per hour and a two year contract. A second bargaining session was held on August 28, 1964, which lasted two hours.

The Union presented a package proposal, including a wage demand of 10 cents per hour. The Company renewed its previous offer. The Union then asked counsel for the Company, Frank Carter, to draft and mail a contract covering the issues discussed. Carter agreed to do so within a week or 10 days. Because of other commitments, the representatives of the Union and the Company did not meet during the month of September. However, on September 26, 1964, a street meeting occurred between Union representative Ralph Cox and Carter, at which Cox inquired about the promised contract draft. Carter stated that the document was in his office. Cox requested a copy through the mail. To that request Carter did not reply.

On October 2, 1964, representatives of the Union and the Company met again. Carter stated at the meeting that a decertification petition had been filed by a representative of the employees in the unit; that the Union no longer represented a majority of such employees, and therefore he refused to bargain further. For the same reason, Carter also refused to submit the promised contract, which had been drafted. Carter, without success, sought to secure the Union's consent to an election.

On September 28, 1964, the decertification petition above referred to was filed with the Regional Director. On October 5, 1964, the Regional Director dismissed the petition, and on the same day the Union filed a charge against the Company in the instant case, in which it alleged that the Company had refused to bargain collectively with the Union as the certified bargaining representative of the employees in the unit.

A complaint was duly filed by the General Counsel, in which it was alleged that on or about October 2, 1964, the Company refused, and at all times since has continued to refuse, to bargain collective-

---

3. While the charge is not in the record, the Examiner and Board took judicial notice of the records of the Board, which showed clearly that the charge was filed on July 20, 1964, and alleged such refusal to bargain. Moreover, it is fairly inferable from the settlement agreement hereinafter referred to. that such charge was filed and alleged such refusal to bargain.

ly with the Union as the exclusive collective bargaining representative of all the employees in the unit. The matter came on for hearing before an Examiner. The Examiner found that by refusing on or about October 2, 1964, to bargain collectively with the Union, the certified bargaining representative of the employees in the unit, the Company had engaged in and is engaging in an unfair labor practice within the meaning of § 8 (a) (5) and (1) of the Act.

The Board adopted the recommended order of the Examiner, which directed the Company to cease and desist from refusing to bargain collectively with the Union, as the certified bargaining representative of its employees in the unit, and so to bargain with the Union and to post appropriate notices.

Under the original Wagner Act, 49 Stat. 449, the Board was authorized to certify a union as the exclusive representative of the employees in an appropriate unit, when it had been determined by an election or any other suitable method that a majority of such employees had authorized such representation. The Board evolved a number of working rules with respect to the exercise of such authority. Under such rules, a certification based on a Board-conducted election must remain in effect for a "reasonable" period, ordinarily "one year," in the absence of "unusual circumstances"; loss of majority support after the end of the "reasonable" period could be questioned either by an employer's refusal to bargain or a petition by a rival union for a new election.[4]

The Board uniformly found an unfair labor practice, where during the "reasonable" period an employer refused to bargain on the ground the certified union no longer possessed a majority.[5]

Under the original Wagner Act, once employees in an appropriate unit had authorized a union to act as their bargaining representative, they could not thereafter take any action to revoke that authority.[6]

By the Labor Management Act of 1947, 29 U.S.C.A. § 141 et seq., the National Labor Relations Act was amended to provide that the employees in an appropriate unit could petition the Board for a decertification election, 61 Stat. 144, 29 U.S.C.A. § 159(c) (1) (A) (ii), and that an employer, if in doubt as to the majority claimed by a union, without a formal election, or confronted by conflicting claims of rival unions, could petition the Board for an election, 61 Stat. 144, 29 U.S.C.A. § 159(c) (1) (B);[7] that Board certification could only be granted as the result of an election, 61 Stat. 144, 29 U.S.C.A. § 159(c) (1); and that after a valid certification or decertification election, a second election could not be held under direction of the Board until a year had elapsed,[8] 61 Stat. 144, 29 U.S.C.A. § 159(c) (3).

In Brooks v. National Labor Relations Board, 348 U.S. 96, 98 and 103, 75 S.Ct. 176, 178 and 181, the court said:

"The issue before us is the duty of an employer toward a duly certified bargaining agent if, shortly after the election which resulted in the certification, the union has lost, without the employer's fault, a majority of the employees from its membership.

*     *     *     *     *     *

"Petitioner contends that whenever an employer is presented with evidence that his employees have deserted their

---

4. Brooks v. National Labor Relations Board, 348 U.S. 96, 98, 99, 75 S.Ct. 176, 99 L.Ed. 125.

5. Brooks v. National Labor Relations Board, supra, at 98, 99, 75 S.Ct. 176.

6. Brooks v. National Labor Relations Board, supra, at 100, 75 S.Ct. 176.

7. Brooks v. National Labor Relations Board, supra, at 101, 75 S.Ct. 176.

8. The Board had ruled that the one-year period runs from the date of certification, rather than the date of election, and the Supreme Court in Brooks v. National Labor Relations Board, supra, at 104, 75 S.Ct. 176, held that such ruling was within the allowable area of the Board's discretion.

certified union, he may forthwith refuse to bargain. In effect, he seeks to vindicate the rights of his employees to select their bargaining representative. If the employees are dissatisfied with their chosen union, they may submit their own grievance to the Board. If an employer has doubts about his duty to continue bargaining, it is his responsibility to petition the Board for relief, while continuing to bargain in good faith at least until the Board has given some indication that his claim has merit. Although the Board may, if the facts warrant, revoke a certification or agree not to pursue a charge of an unfair labor practice, these are matters for the Board; they do not justify employer self-help or judicial intervention. The underlying purpose of this statute is industrial peace. To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end, it is inimical to it. Congress has devised a formal mode for selection and rejection of bargaining agents and has fixed the spacing of elections, with a view of furthering industrial stability and with due regard to administrative prudence."

The one year after the election in the instant case expired on September 26, 1964. The refusal to bargain after the settlement agreement occurred on October 2, 1964.

The question here presented is whether the Company was required to bargain with the Union pursuant to the settlement agreement, after the one-year period had expired and after a majority of the employees in the unit had filed a decertification petition.

■ An employer may not seek to vindicate the rights of his employees to select their bargaining representative, nor rely on employees' rights in refusing to bargain with a formally certified union.[9]

Settlement agreements are essential to an effective administration of the Act. A large majority of the cases coming before the Board is disposed of by settlement agreements, without a formal hearing or order. They save the respondent against whom a charge has been filed the time, trouble and expense which litigation would entail. They make formal hearing and action by the Board unnecessary. Without them, the administration of the Act by the Board would be greatly impaired, due to the overwhelming load of cases. Accordingly, if possible, settlement agreements should be given an effect that will encourage both the Board and the respondent to enter into them.

To permit a respondent, after entering into a settlement agreement by which he agrees to bargain with his employees in an appropriate unit, to refuse to bargain pursuant to the settlement agreement before the lapse of a reasonable time, on the ground that a union no longer represented a majority of the employees in the unit, would greatly impair the efficacy of a settlement agreement and greatly reduce the number of cases in which the Board could properly enter into settlement agreements.

■ Accordingly, we hold that the Company was required, under the settlement agreement, to bargain with the Union for a reasonable time after the date of the approval of the settlement agreement, even though the year from the date of certification had expired, and without regard to any changes in the Union's majority status during such reasonable period. The views we have expressed and the conclusions we have reached are supported by the adjudicated cases.[10]

9. See Brooks v. National Labor Relations Board, supra, at 103, 75 S.Ct. 176.

10. Poole Foundry & Mach. Co. v. National Labor Rel. Bd., 4 Cir., 192 F.2d 740, c. d. 342 U.S. 954, 72 S.Ct. 626, 96 L.Ed. 709; N. J. MacDonald & Sons, Inc. v. NLRB, 1 Cir., affm'g N. J. MacDonald & Sons, Inc., and Local 3126, United Brotherhood of Carpenters & Joiners of America, AFL-CIO; NLRB v. Stant Lithograph, Inc., C.A.D.C., 297 F.2d 782; NLRB v. H. E. Fletcher Co., 1 Cir., 298 F.2d 594, 600.

The Company contends that at the time it entered into the settlement agreement it had not refused to bargain with the Union as the representative of the Company's employees in the unit, and that the settlement agreement could not be construed as an admission or determination that it had done so; and that since it continued to bargain with the Union until after the expiration of one year from the certification and after substantially all of the employees in the unit, by a request for decertification, repudiated the Union as its representative, it was not required to continue to bargain with the Union on and after October 2, 1965.

It is true that the settlement agreement was not an admission that the Company had been guilty of an unfair labor practice by refusing to bargain, but a party who enters into a valid compromise agreement for the settlement of litigation may not thereafter escape its obligation to carry out the settlement agreement, on the ground that the claim asserted against it, which was settled by the agreement, was groundless. Moreover, the Board, by entering into the settlement agreement, clearly manifested an administrative determination by it that some remedial action was necessary and it made concessions to secure the remedial action provided for by the settlement agreement.

We do not undertake to pass upon what would constitute a reasonable time for the Company to continue to bargain with the Union. That depends upon the circumstances of the case.

If the Company concludes it has bargained for a reasonable time after the date of the approval of the settlement agreement, it may petition the Board for relief. The determination of what would constitute a reasonable time is first for the determination of the Board, and during the pendency of such petition for relief, the Company should continue to bargain in good faith.

The order will be enforced.