**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PACE OLDSMOBILE, INC.,
Respondent.**

**No. 1052, Docket 81–4207.**

United States Court of Appeals,
Second Circuit.

Argued May 24, 1984.
Decided July 18, 1984.

Stuart M. Kirshenbaum, Hewlett, N.Y. (Lawrence I. Milman, Milman, Naness & Pollack, Hewlett, N.Y., of counsel), for respondent.

Christopher W. Young, N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Linda Dreeben, N.L.R.B., Washington, D.C., of counsel), for petitioner.

Before LUMBARD, MESKILL and KEARSE, Circuit Judges.

MESKILL, Circuit Judge:

This is a petition by the National Labor Relations Board (the Board) for enforcement of its Supplemental Decision and Order in *Pace Oldsmobile, Inc.*, 265 N.L.R.B. 1527 (1982).[1] We deny enforcement for the reasons set forth below.

The instant petition had its genesis in various unfair labor practices committed by the respondent-employer Pace Oldsmobile, Inc. (Pace) in late 1979 and early 1980 during the course of Amalgamated Local Union 355's (the Union) campaign to organize Pace's service and parts department employees. The facts are set forth in our prior opinion in this matter, *NLRB v. Pace Oldsmobile, Inc.*, 681 F.2d 99 (2d Cir.1982) (per curiam) (*Pace I*). In *Pace I*, we enforced so much of the Board's order in *Pace Oldsmobile, Inc.*, 256 N.L.R.B. 1001 (1981), "as requires Pace to cease and desist from engaging in the unfair labor prac-

---

1. On August 18, 1983, Pace Oldsmobile, Inc. moved the Board for reconsideration and vacatur of the Supplemental Decision and Order. The Board denied the motion on December 9, 1983. The Board petitioned for enforcement of its Supplemental Decision and Order on January 16, 1984.

tices directed against its employees, and to reinstate and make whole certain employees." 681 F.2d at 101. However, we refused to enforce the part of the order requiring Pace to bargain with the Union. We held that the Board's determination that Pace's conduct made a fair election unlikely "was not preceded by the kind of analysis that we require before enforcing so drastic an order." *Id.* We remanded the case to the Board with instructions to conduct a proper analysis of the possibility that a fair and free election could be held. We also directed the Board on remand to consider whether changes and turnover within the bargaining unit subsequent to the unfair labor practices rendered a bargaining order inappropriate. *Id.* at 102.

On remand, the Board determined without the benefit of a hearing that "the possibility of erasing the effects of [Pace's] unfair labor practices and of ensuring a fair rerun election by the use of traditional remedies is slight, and that employees' representational sentiment once expressed through authorization cards would, on balance, be better protected by our issuance of a bargaining order than by traditional remedies." 265 N.L.R.B. at 1529–30. The Board reaffirmed its initial order requiring Pace to bargain with the Union. The Board again asks us to enforce its order.

In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court determined that a bargaining order may be issued by the Board, without inquiry into the majority status of the union, in "exceptional" cases where "outrageous" and "pervasive" unfair labor practices have made a fair election impossible. *Id.* at 613–14, 89 S.Ct. at 1939–1940. The Court went on to state that a bargaining order is permissible in "less extraordinary cases" where there was a showing that the union had a majority at some point and "the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election ... by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance,

be better protected by a bargaining order." *Id.* at 614–15, 89 S.Ct. at 1940–1941.

Bargaining orders are considered "drastic" remedies and are not favored. *NLRB v. Knogo Corp.*, 727 F.2d 55, 60 (2d Cir.1984). "The clearly preferred remedy for violation of the Act is an election." *NLRB v. Marion Rohr Corp.*, 714 F.2d 228, 230 (2d Cir.1983) (citations omitted). "This preference reflects the important policy that employees not have union representation forced upon them when, by exercise of their free will, they might choose otherwise." *Id.* (citations omitted). "A bargaining order is justified only when the Board demonstrates that an election is unlikely to reflect the uncoerced preference of the bargaining unit." *Id.* (citations omitted). "Only where there is a substantial danger that employees will be inhibited by the employer's conduct from adhering to the union should a bargaining order issue." *J.J. Newberry Co. v. NLRB*, 645 F.2d 148, 154 (2d Cir.1981). The Board must "make a particularly thorough analysis of the need for a bargaining order," *NLRB v. Heads and Threads Co., A Division of MSL Industries, Inc.*, 724 F.2d 282, 289 (2d Cir.1983) (citation omitted), and "the Board may issue a bargaining order only after it has taken evidence and made appropriate findings as to the need for the bargaining order at the time it is issued." *Id.* (citation omitted).

We have held on numerous occasions that the presence of "hallmark," or highly coercive, unfair labor practices does not automatically call for a bargaining order. *See, e.g., NLRB v. Windsor Industries, Inc.*, 730 F.2d 860, 866–67 (2d Cir.1984); *Marion Rohr Corp.*, 714 F.2d at 230–31. "Rather than react in knee jerk fashion to the presence of a hallmark violation, the Board must still analyze the nature of the misconduct and the surrounding and succeeding events in each case in an effort to assess the potential for a free and uncoerced election under current conditions." *J.J. Newberry Co.*, 645 F.2d at 153. The Board must consider "mitigating circumstances" and should not make "conclusory

statement[s]." *Marion Rohr Corp.*, 714 F.2d at 230–31. "[E]vents subsequent to the employer's violations, such as the passage of time and the substantial turnover of employees, are relevant and important factors which should be considered." *Id.* at 231 (citations omitted). Employee turnover is particularly important because "when there has been a large turnover in employees between unfair practices and a Board's order, '[t]he effect of a bargaining order could thus easily be to impose upon the employees a union not desired by the [great] majority of them.'" *Knogo Corp.*, 727 F.2d at 60 (quoting *J.J. Newberry Co.*, 645 F.2d at 154).[2]

In *Pace I*, we expressed considerable skepticism of the Board's order requiring Pace to bargain with the Union. We noted that the strike conducted by the employees after most of the unfair labor practices were committed tended to show that the employees were not intimidated by Pace's conduct, and thus that a fair election was a realistic possibility. 681 F.2d at 102. In addition, we directed the Board to consider the effect of employee turnover on the need for a bargaining order. *Id.* Other factors which the Board should have weighed on remand include whether the employer continued to engage in anti-union activity, whether the present employees were aware of Pace's prior violations and, if so, their "demonstrated reaction" thereto. *See Marion Rohr Corp.*, 714 F.2d at 231. *See also Heads and Threads Co.*, 724 F.2d at 289.

Following the remand in *Pace I*, the Board did not hold a hearing in order to take new evidence. It invited the parties to submit statements of position and rendered its decision therefrom. The Board examined the record and concluded that the nature of Pace's conduct rendered a fair election unlikely. The Board found that the employer's actions were serious and "could not be lost on other employees who might desire to participate in the organizational

efforts." 265 N.L.R.B. at 1528. It determined that the impact of Pace's unilateral granting of benefits was "enduring" because "these favors are consistently received by employees over the course of their employment." *Id.* at 1529. In response to our earlier suggestion that the employees' willingness to strike belied an inference of intimidation, the Board stated that the one unfair labor practice committed after the strike ended in February 1980 —Pace's refusal to reinstate three strikers and its demotion of a fourth—was alone sufficiently coercive to quash whatever independence had been demonstrated by the employees up until that time. The Board failed to mention that *Pace I* enforced the portion of the order reinstating the fired employees and making them whole. Addressing the turnover question, the Board stated that Pace's conduct

> would not only affect employees who were employed at the outset of the union activity, but also those who came to the employment either during or after the strike. Thus, even if [Pace's] employee complement has undergone the turnover claimed by [Pace], it is reasonable to assume that [Pace's] actions before and after the strike would be the topic of discussion and repetition, and that the coercive, chilling impact would linger long after the strike participants had either returned to or departed from [Pace's] employ.

*Id.* (footnotes omitted). The Board then added that "substantial turnover does not warrant the withholding of a bargaining order, especially where, as here, the employer has engaged in 'hallmark' violations such as the discharge of union adherents and the threat of plant closure." *Id.* (citations omitted).

■ We conclude that the Board has once again engaged in the type of superficial and conclusory analysis criticized in *Pace I*. The Board failed to analyze in

---

**2.** The Board's recent decision in *Gourmet Foods, Inc.*, 270 N.L.R.B. No. 113 (May 14, 1984), abandoning the practice of issuing minority bargaining orders, reflects the importance to national labor policy of protecting employees' freedom of choice against this type of compelled representation.

depth the factors which militate against a bargaining order and relied instead on unsupported assumptions to justify its decision. For example, the Board did not consider the effect of turnover in the unit despite the fact that approximately half of those employed in the unit at the time the bargaining order was issued had not been employed when the unfair labor practices were committed. *Cf. Knogo Corp.*, 727 F.2d at 60–61 (60% turnover in unit renders bargaining order inappropriate without a reasoned finding that a free election is improbable); *Marion Rohr Corp.*, 714 F.2d at 231 (35% turnover). The Board merely assumed that the unfair labor practices "would be the topic of discussion and repetition" among both old and new employees. 265 N.L.R.B. at 1529 (footnote omitted). Moreover, the Board's statement that substantial turnover does not militate against a bargaining order where the employer has engaged in "hallmark violations" is wrong as a matter of law. *See, e.g., Windsor Industries, Inc.,* 730 F.2d at 867 ("The law of this circuit is that hallmark violations alone do not support a bargaining order, and that not only mitigating circumstances but the lapse of time, employee turnover and other significant factors must be examined." (footnote omitted)). The Board failed to discuss the significance of the passage of three years between the unfair labor practices and its supplemental order. *Cf. Marion Rohr Corp.,* 714 F.2d at 232 (nearly three years between unfair labor practices and bargaining order). The Board did not inquire or discuss whether Pace has refrained from engaging in further anti-union conduct. Finally, the Board's rationale for refuting the Court's concern in *Pace I* that the strike indicated a lack of intimidation on the employees' part is not convincing.

The Board made no attempt to determine if the unfair labor practices continued to have an *actual* chilling effect on the possibility of a fair and free election. The Board failed to conduct a hearing and did not solicit additional evidence, relying instead on unsupported speculation about the impossibility of conducting an election free from the lingering coercive effects of Pace's unfair labor practices. This superficial analysis is exactly what we sought to avoid by remanding in *Pace I.*

"In the exercise of our equitable power, and in full recognition of the Board's continuing failure to comply with our request for reasoned analyses, we decline to remand the bargaining order to the Board for its further consideration." *Marion Rohr Corp.,* 714 F.2d at 232 (citations omitted). Four and one-half years have elapsed since the charges were filed, a delay primarily attributable to the Board. Another remand would be pointless. Any further organizing activity at Pace should start afresh.

Pace's request for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 (1982), is denied.

Enforcement denied.